**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

**BRENT E. HATCH,**

    **Plaintiff,**

    v.

**FIRST HORIZON NATIONAL CORPORATION, et al.,**

    **Defendants.**

**Case No. 2:09-CV-870**

**Judge Peter C. Economus**

**MEMORANDUM OPINION AND ORDER**

This matter is before the Court for consideration of Defendants First Horizon Nation Corporation and First Horizon Home Loans' (collectively, "First Horizon") Motion for Summary Judgment. (Doc. # 31.) In response to First Horizon's motion, Plaintiff Brent E. Hatch ("Hatch") filed a memorandum in opposition (doc. # 33), to which First Horizon filed a reply (doc. # 35). In their motion, First Horizon seeks an order from this Court granting judgment in their favor on all of Hatch's claims. Because this Court finds that a genuine issue of material fact exists regarding whether Hatch was fired "for cause," this Court hereby **DENIES** First Horizon's motion. Further, because the Court did not consider the evidence relevant to First Horizon's Motion to Strike (doc. # 34), that motion is hereby rendered **MOOT.**

**I.**

The factual background is largely undisputed.[1] Plaintiff was employed by First Horizon Home Loans as a Senior Vice President/Market Manager on or about March 1, 2007. (Complaint, doc. # 3, ¶ 1; Mot. Summ. J., Mem. In Supp., doc # 31-1, page 1.) In January 2008, First Horizon decided to exit the national construction lending market, which led to the eventual sale of First Horizon Home Loans and the winding down of its construction-lending

---

[1] Although there is very little dispute over the underlying facts, this Court must take all facts in a light most favorable to Mr. Hatch, the nonmoving party.

business. (Mem. In Supp., page 4.) As "an incentive to stay" with First Horizon during its phase out of its construction-lending business, Hatch was selected, along with others, to be on a "retention team" which was "tasked with closing out specified loans." (Complaint, ¶ 1; Mem. In Supp., page 5.) Hatch was sent a "retention letter that, among other terms and conditions, provided for a bonus upon the successful completion of the retention assignment." (Mem. In Supp., page 5.) He received the first retention letter on or about January 13, 2008, and the second retention letter on or about June 26, 2008. (Complaint, ¶¶ 1 – 2; Mem. In Supp., pages 5 – 6.) Those letters are identical in pertinent part, as follows:

> We have identified you as an employee without whose valuable services we would be unable to complete the transition. Therefore, we request that you continue in your current capacity with First Horizon Home Loans until the sale or other disposition of the Company. There will be a number of activities, action items and accomplishments that we are requesting your assistance in completing. . . .
>
> If for any reason your job is eliminated during the transition, you would be entitled to both the retention bonus and to benefits under First Horizon's severance program. . . .
>
> Please note that if you accept another position with First Horizon prior to the end of the agreed upon retention period, neither your retention bonus nor any severance benefits would be paid. In addition, if you voluntarily resign from First Horizon before the end of the agreed upon retention period or if you are terminated "for cause", you will not be entitled to either the retention bonus or to severance benefits.

(Complaint, Exhs. 1 and 2; Mem. In Supp., pages 5 – 8, quotation marks in original). Nowhere in the record is there a definition of the quoted term "for cause."

One of Hatch's assigned loans was for a property in Maine ("the RTG loan") that had already been identified by First Horizon as having a "potential weakness, like, for example, sales in the area of the project had slowed in recent months." (Mem. In Supp., page 10.) Because of

2

its weak status, this loan fell into the category of "Watch or Worse," requiring Hatch to prepare a "WOW report" on a quarterly basis. (*Id.*) In addition to preparing this quarterly report, Hatch was "expected" to keep his supervisor, Alan Drewer, "apprised of important developments impacting WOW loans or credits . . . even if a quarterly WOW report was not otherwise due." (*Id.*, page 9, citing to Mot. Summ. J., Exh. 3, Drewer Dep.[2]) On July 16, 2008, Hatch emailed his co-worker, Husain Nuri, alerting Nuri to liens that had been filed against the RTG loan property. (*Id.*, page 10, citing to Mot. Summ. J., Exh. 2, Hatch Dep.) In that email, Hatch noted that the RTG credit was "sinking fast," and he recommended that the RTG loan be downgraded in future WOW reports. (*Id.*) In addition, as a result of this negative activity surrounding the RTG loan, Hatch ordered a new appraisal of the property development's value. (Mem. In Opp., doc. # 33, Exh. 1, Hatch Aff., ¶ 24.)

According to First Horizon, when a loan in excess of one million dollars is graded at a "Classified-substandard, non-accrual" level, a lender is required to prepare a "FAS-114 accounting form" to be reviewed by federal regulators. (Mem. In Supp., page 11.) Hatch and Nuri prepared an FAS-114 for the RTG loan, and, on or about August 11, 2008, that report was sent via email to Senior Credit Officer Jim Leeds and to Alan Drewer. (*Id.*, page 11; Hatch Dec. ¶ 28.) "Drewer normally relied on Leeds to review [the FAS-114s] first." (Mem. In Supp., page 11.) The RTG FAS-114 "incorporated the new appraisal that had been ordered by [Hatch]" which showed RTG's drop in value. (*Id.*, page 12.)

On August 13, 2008, "Drewer conducted a conference call with members of his team." (*Id.*) "During the call, [Hatch] stated that he had received a new appraisal on the RTG loan and

---

[2] Because First Horizon attached only portions of the Drewer and Hatch depositions, citations to either document is to the CM/ECF page number.

3

that there was a deficiency." (*Id.*, internal quotation marks omitted; Hatch Aff., ¶ 29.) Hatch states as follows:

> During the conversation, I informed Drewer and [Senior Vice President Dave] Bowman that an appraisal had been received for RTG and was currently being reviewed, and that based on the preliminary values, there would be a deficiency on the RTG account, although I did not yet know how large the deficiency would be. At that point, I was unsure of the deficiency amount because I had not yet received the final appraisal back from [First Horizon's] appraisal department, nor had we decided on a course of action to take with the borrower that could affect the ultimate value and repayment of the loan. . . .
>
> At that point in time, I had no indication that Drewer had not yet reviewed the submitted FAS-114 forms, as this was part of his job.

(Hatch Aff., ¶¶ 29 – 30.)

The next day, August 14, Senior Vice President Dave Dawson requested the FAS-114s for several loans, including the RTG loan. (Mem. In Supp., page 12.) "Although the FAS-114s were yet to be finalized, Dawson needed them for a meeting with senior management." (*Id.*) Upon learning of RTG's probable decrease in value, "Dawson sent an e-mail to [Hatch], in which he copied Alan Drewer, seeking 'some explanation as to what happened here?'" (*Id.*) Hatch responded to Dawson's email, copying Drewer, noting that "the value used on the RTG FAS-114 was not the final value, as the preliminary appraisal had yet to be reviewed by [First Horizon's] appraisal department." (Hatch Aff., ¶ 32.) Because he "had not had a chance to review the reports" that were attached to the August 11 email (Drewer Dep., page 15), Drewer did not know about the problem with the RTG loan until he read Dawson's email on August 14 (Mem. In Supp., page 13). Drewer took exception to Hatch's form of notification, and immediately thereafter, Hatch was terminated. That termination was "for cause," since in Drewer's opinion, "someone with [Hatch's] experience and expertise should have immediately

4

notified" him of the drop in value and "[n]ot doing so was unacceptable and warranted [Hatch's] immediate termination." (Drewer Dec., ¶ 41.) Further, First Horizon determined that "because [Hatch] was terminated 'for cause,' he was not entitled to a retention bonus or severance benefits." (*Id*., ¶ 43.) Hatch asserts that his termination was *without* cause, and he seeks the benefits outlined in the two retention letters. (*See* Complaint.) Because there is no dispute between the parties that the retention letters form the basis of the employment agreement between them (*see* Answer, doc. # 6), the only issue before the Court upon First Horizon's motion is the nature of Hatch's termination.

## II.

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R. Civ.P. 56(c). The moving party bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrates the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The movant may meet this burden by demonstrating the absence of evidence supporting one or more essential elements of the non-movant's claim. *Id.* at 323-25. Once the movant meets this burden, the opposing party "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ.P. 56(e)).

Once the burden of production has so shifted, the party opposing summary judgment cannot rest on its pleading or merely reassert its previous allegations. It is not sufficient "simply

[to] show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, Rule 56(e) "requires the non-moving party to go beyond the pleadings" and present some type of evidentiary material in support of its position. *Celotex*, 477 U.S. at 324; *see also Harris v. General Motors Corp.*, 201 F.3d 800, 802 (6th Cir. 2000). Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

"In considering a motion for summary judgment, the Court must view the facts and draw all reasonable inferences therefrom in a light most favorable to the nonmoving party." *Williams v. Belknap*, 154 F.Supp.2d 1069, 1071 (E.D. Mich. 2001) (citing *60 Ivy Street Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir. 1987)). However, "'at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter,'" *Wiley v. U.S.*, 20 F.3d 222, 227 (6th Cir. 1994) (quoting *Anderson*, 477 U.S. at 249); therefore, "[t]he Court is not required or permitted . . . to judge the evidence or make findings of fact." *Williams,* 154 F.Supp.2d at 1071. The purpose of summary judgment "is not to resolve factual issues, but to determine if there are genuine issues of fact to be tried." *Abercrombie & Fitch Stores, Inc. v. Am. Eagle Outfitters, Inc.*, 130 F.Supp.2d 928, 930 (S.D. Ohio 1999). Ultimately, this Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52; *see also Atchley v. RK Co.*, 224 F.3d 537, 539 (6th Cir. 2000).

### III.

First Horizon states that the "terms and conditions" of Hatch's employment were outlined in the nearly identical two retention letters. (Mem. In Supp., page 5.) Under those terms, Hatch

6

had a term of employment that lasted until the "sale or other disposition" of the company. (*See* Retention Letters, Exhs. 1 and 2 of Complaint; Mem. In Supp., pages 5 – 8.) If Hatch were terminated *without* cause prior to that end date, he would be entitled to various benefits. If Hatch's termination was for cause, he is not entitled to those benefits. Because the term "for cause" is not defined by the retention letters, we must look to Ohio case law for guidance.[3] First Horizon points to three cases in support of its claim that Hatch's termination was for cause: *Beckman v. Garrett*, 66 Ohio St. 136, 64 N.E. 62 (1902), which outlines the standard for determining "just cause," *Dayton Rubber Mfg. Co. v. Brown*, 116 Ohio St. 373, 156 N.E. 136 (1927), and *Becker v. Goodyear Tire and Rubber Co.*, 2006-Ohio-1484, 2006 WL 786516 (Ohio Ct. App. 9th Dist.).

In *Beckman*, the Supreme Court of Ohio held that to justify the discharge of an employee before the term of his employment expires, an employer must show the employee's "default of his duty *without reasonable excuse*," and that such default had a "natural tendency" to injure the business. 156 N.E. at 137 (emphasis added).

In *Dayton Rubber*, the "sole question in the trial court was whether or not the company was justified in discharging [the plaintiff]." 156 N.E. at 137. A jury had returned a verdict in favor of the plaintiff, and the Court of Appeals affirmed. The Supreme Court, however, noted that the plaintiff's own uncontroverted testimony formed the basis of his dismissal for cause:

> Mr. Brown had tendered his resignation on August 16, 1922, to take effect December 31 of that year, and, if he had carried out all of the plans and purposes, which he freely admitted and declared in his testimony in the trial court, it is very clear that the natural tendency of the execution of those purposes would not only have been injurious to, but in all human probability would have resulted in the bankruptcy of, the corporation.

---

[3] There is no dispute that Ohio law governs the employment agreement.

7

*Id.* The court also noted that "[m]any other statements were made by [plaintiff] in his testimony, showing his arrogance, his disloyalty, and his rule or ruin policy." *Id.* The court found that plaintiff's "testimony makes a conclusive case against himself. It does not involve a determination of the weight of conflicting testimony." As a result, under *Beckman*, the court found that "the company could not do otherwise than discharge [plaintiff] under the circumstances, and, having the right to discharge him, cannot be compelled to respond in damages for nonpayment of his salary during the remainder of his term of office." *Id.*

Similarly, in *Becker*, there was "uncontroverted evidence" that an employee's termination was for cause. In all three cases cited by First Horizon, there was no evidence in support of the contention that the former employee was *not* fired for cause.

Here, the evidence is not so clear. First Horizon states that its basis for terminating Hatch was his failure "to report the problem [with the RTG loan] to Drewer as he was required and expected to do." (Mem. In Supp., page 18.) Drewer himself said that he was "to be alerted or notified of any—anything a market manager thought was significant for me to know" including a decrease in value such as experienced by the RTG loan. (*Id.*, page 15.) But First Horizon admits that it was aware of the fragile state of the RTG loan prior to the events that led to Hatch's termination. The RTG loan had already been identified as having a "potential weakness, like, for example, sales in the area of the project had slowed in recent months." (*Id.*, page 10.) On August 11, 2008, Drewer was copied on an email from Hatch to Jim Leeds—an email that contained reports regarding the RTG property. (Drewer Dep., page 5.) The text of the email requested review of the reports which contained the information at issue: a drop in the property value by several million dollars. Drewer testified at his deposition as follows:

> A. Well, typically if I received an email like this—and this is probably the first draft of the FAS-114s—and they've gone to Jim

8

> Leeds, I would wait for Jim to review them, discuss it with the [relationship manager] until Jim told me it—they were ready to be reviewed.
>
> Q. If Jim Leeds found anything significant as a change in the FAS-114s from the prior ones, would he alert you to that?
>
> A. If he thought it was significant enough.
>
> Q. And he would do that by either calling you or talking to you if you're in the office?
>
> A. Yes.
>
> Q. And do you remember Jim alerting you to any significant changes in these 114s on August 11th or shortly thereafter?
>
> A. I do not.

(*Id.*, page 7.) Although Drewer was informed by email, he maintains that this notification was insufficient because of the importance of the information and because he did not have time to review the emailed reports. Yet Drewer *was* verbally informed when he and Hatch were part of a conference call on August 13, 2008, in which Hatch stated that "he had received a new appraisal on the RTG loan and that there was a deficiency." (Mem. In Supp., page 12, internal quotation marks omitted.) Apparently, according to Drewer, that verbal notification was inadequate because Hatch left "those attending the conference call with the impression that, while there was a deficiency, it would not exceed the ordinary reserve for a loan of that size." (Drewer Dec., ¶ 36.)

Rather, Drewer states, Hatch should have called him to inform him of the specific amount of the deficiency. He admits, though, that Hatch had not called him in the past when a "significant change" in a loan occurred:

> Q. Do you recall [Hatch] calling you whenever there was a significant change in one of the assets prior to this time?

> DREWER: I don't recall—I don't recall him ever calling me on any other significant changes such as this one.
>
> Q. Where is the protocol established that requires your RMs to call you whenever there's a significant change in position on a—
>
> A. It's called professionalism.
>
> ( . . . )
>
> What I'm saying is my employees should—should do their job [sic] and pay attention to what's going on with their credits; and if there's something significant that I need to know about, they should let me know, and on the phone, not in writing.

(*Id.*, pages 20 – 21.)

Under the *Beckman* standard, to terminate an employee for cause, an employer must show the employee's "default of his duty *without reasonable excuse*," and that such default had a "natural tendency" to injure the business. 156 N.E. at 137. Taking the evidence in a light more favorable to Hatch, there is a genuine factual dispute whether Hatch was terminated for cause. Although specifically terminated for his failure to verbally inform Drewer of the deficiency in the RTG loan, Hatch verbally informed Drewer "on the phone, not in writing" during the August 13 conference call that "there was a deficiency" in the RTG loan. In addition, Hatch had notified Drewer via the August 11 email, to which reports on RTG were attached. A jury may determine that any "default" in Hatch's duty to inform Drewer was reasonably excused by his belief that (1) Drewer had read the reports attached to the August 11 email, and (2) Drewer had heard Hatch state that there was a deficiency in the RTG loan during the August 13 conference call. In sum, there is sufficient evidence to create a genuine issue of material fact regarding Hatch's termination and, therefore, his eligibility for benefits under both retention letters. *See Zimmerman v. Eagle Mtg. Corp.*, 110 Ohio App.3d 762, 775, 675 N.E.2d 480 (2d Dist. Ct. App. 1996) (applying the *Beckman* standard for determining just cause, and finding that "competent

and credible evidence" existed to show that the former employees were terminated for "less than just cause.")

As a result of the foregoing, Defendants First Horizon National Corporation and First Horizon Home Loans' Motion for Summary Judgment is **DENIED.**

## IV.

For the reasons discussed above, the Court hereby **DENIES** Defendants First Horizon National Corporation and First Horizon Home Loans' Motion for Summary Judgment. (Doc. # 31.) Further, the Court hereby renders **MOOT** Defendants' Motion to Strike. (Doc. # 34.)

**IT IS SO ORDERED.**

**/s/ Peter C. Economus - December 15, 2011**
**UNITED STATES DISTRICT JUDGE**